# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-cv-1025-MEF |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| MENTAL HEALTH AND MENTAL | ) | (WO) |
| RETARDATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a case in which Plaintiff, the United States of America ("United States"), contends that the Alabama Department of Mental Health and Mental Retardation ("the Department") violated the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq.* ("USERRA"), by failing to promptly reemploy Roy Hamilton ("Hamilton") upon his return from military duty. After weighing the evidence and testimony offered by the parties during a bench trial, the Court finds that judgment is due to be entered in favor of United States and against the Department. In support of this judgment, the Court makes the following findings of fact and conclusions of law:

### I. FINDINGS OF FACT

1. The Department is a state service agency established by the Code of Alabama.

2. The Department is a large employer with numerous employees at a variety of locations throughout the state.

3. On July 13, 1987, the Department hired Hamilton as a custodial worker at the J.S. Tarwater Developmental Center ("Tarwater").

4. Initially, Hamilton's job responsibilities involved maintaining the grounds at the Department's Tarwater facility.

5. In 2002, the Department reduced custodial positions when it contracted out all housekeeping services at Tarwater.

6. Having eliminated these in-house positions, the Department assigned the former housekeeping and custodial staff to assisting the Mental Health Workers.

7. The Department created a new job classification for the former housekeeping and custodial staff known as Mental Health Assistant ("MHA").

8. In 2002, the Department reclassified Hamilton from housekeeping/custodian to MHA.

9. As an MHA, Hamilton's job responsibilities included transporting mental health patients to and from different locations and helping patients learn life skills, such as cleaning.

10. In 2002, Hamilton, and other MHAs at Tarwater, took a promotional examination for the Mental Health Worker I ("MHW") position.

11. Hamilton passed the MHW exam, but he, and others, declined the promotion and elected to continue working as a MHA.

12. The Department expressly classified the MHA position as a "permanent" position.

13. In mid-August 2003, employees of the Department were notified of the approved plan for consolidation and closure of several Department facilities.

14. In August 2003, the Department asked each employee in a facility slated for closure, including Tarwater, to complete, sign, and return a form indicating their desires for alternative employment.

15. Hamilton completed the form on August 29, 2003, indicating he was available to relocate to the Department's Central Office in Montgomery, Alabama, or to Greil Psychiatric Hospital ("Greil"), also in Montgomery.

16. Unbeknownst to Hamilton, at that time, neither of those two locations had any vacancies for MHAs.

17. During Hamilton's tenure at Tarwater, he was also a member of the United States Army National Guard.

18. He served in the Alabama National Guard ("National Guard") for 28 years as a Support Specialist Non-Commissioned Officer (E-5) with the Military Police in Prattville, Alabama.

19. The National Guard stems from Article I, Section 8 of the U.S. Constitution and operates under joint federal and state control.

20. In October or November of 2003, the National Guard notified Hamilton that he would be going on a long-term deployment to Iraq in support of Operation Iraqi Freedom.

21. When Hamilton learned of his deployment in the fall 2003, his supervisor at Tarwater was Michael Lackey ("Lackey"), and Hamilton's reviewing supervisor was Robert Wisenbaker.

22. Pursuant to the Department's policy at that time, Hamilton notified Lackey that he would be going on a long-term deployment, beginning some time near Christmas.

23. After Hamilton notified Lackey of his military deployment, Hamilton learned for certain that the Department intended to close the Tarwater facility on December 31, 2003.

24. In an effort to find alternative placements for Tarwater's employees, the Department offered Hamilton a transfer to a facility near Tuscaloosa, Alabama, to fill the position of MHW.

25. The Department required Hamilton to accept or decline this offer, despite the fact that Hamilton had already told Department officials that he was being deployed to Iraq, and Hamilton's activation was scheduled to occur about the time the transfer would have become effective.

26. Department officials assured Hamilton that they would continue to look for other opportunities for him if he declined the transfer.

27. Consequently, on November 24, 2003, Hamilton signed the form and declined the offer to transfer to a position at the Department's facility in Tuscaloosa. At the time Hamilton signed this form, he knew he was going to be deployed.

28. Following Hamilton's declination of the transfer, the Department successfully relocated several other the Department employees from Tarwater who, like Hamilton, declined an initial offer of transfer.

29. Many of Hamilton's coworkers from the Tarwater facility eventually found job placements at Greil and other locations closer to Montgomery than Tuscaloosa.

30. On or about December 22, 2003, Hamilton received his actual written military Orders for active duty. According to his Orders, Hamilton was to report for active duty on January 2, 2004.

31. On the day he received the Orders, Hamilton was working with his National Guard unit preparing for their deployment.

32. Hamilton immediately drove to Tarwater and handed a copy of his written Orders to Lackey.

33. Hamilton's last day worked with the Department was on or about December 29, 2003, after which he took several days of accrued leave to prepare for his deployment.

34. When Hamilton departed for military leave on or about December 29, 2003, Tarwater was up and running, and nobody gave Hamilton any documentation stating that he was separated, or about to be separated, from his employment with the Department.

35. As of Hamilton's departure for military leave, he had worked for the Department for 16 years and five months.

36. Effective December 31, 2003, the Department considered Hamilton to have "voluntarily resigned" based upon his declination of the transfer to Tuscaloosa on November 23, 2003. Hamilton had already departed to prepare for his military deployment by December 31, 2003.

37. Hamilton began his active duty military service on January 2, 2004.

38. Hamilton's administrative separation from the State of Alabama Personnel Department ("SPD") was approved on or about January 15, 2004. The SPD separation

document expressly states "continued efforts will be made to find alternative employment for [Hamilton] who declined offer of directed transfer."

39. Tarwater permanently closed on January 15, 2004.

40. Hamilton was on active duty from January 2, 2004 until his honorable discharge on April 11, 2005.

41. During his deployment, Hamilton withdrew funds from his retirement account due to financial hardship. When he did so, the Department did not tell him that he was no longer an active employee.

42. Also during his deployment, in May 2004, the Department sent Hamilton a letter regarding its continuing efforts to assist employees displaced as a result of the consolidation and closure of facilities with finding alternative placements.

43. Hamilton received this letter when he returned home from Iraq, and assumed that it meant the Department may have found a new placement for him since Tarwater's closure.

44. In April 2005, during the same month as Hamilton's release from active military service, Hamilton sought reemployment with the Department.

45. With his military orders in hand, and dressed in his military uniform, Hamilton first went to Greil, which is where he had heard several of his Tarwater co-workers were working.

46. He explained his situation to the receptionist at Greil and asked if he was employed there.

47. She told him that he was not, and suggested he check with the Department's Central Office.

48. That same day, Hamilton went to the Central Office and sought reemployment.

49. On the same day, Hamilton went to what he believed was the Alabama State Personnel Department ("SPD") to seek assistance with reemployment. Again, Hamilton explained his situation. The receptionist told Hamilton that he had to direct his reemployment request to the Department's Central Office.

50. Over the weeks and months that followed, Hamilton continued to request reemployment at the Department. He made telephone calls and made in-person visits.

51. The Department did not reemploy Hamilton in 2005.

52. Hamilton did not incur or aggravate a disability during his military service, and was fully capable of returning to his pre-service or any similar position.

53. In 2005, Hamilton was qualified for MHA, MHW, custodial worker, laborer, and groundskeeper positions.

54. The Department could have returned Hamilton to work in 2005 after his initial request for reemployment.

55. Because the Department did not reemploy Hamilton in 2005, out of necessity, applied for and received unemployment benefits. Additionally, he sought alternative employment. He accepted a position with Norment Security in November of 2005, and worked there through early 2007.

56. He also worked at Big Lots in 2007.

57. In 2007, Hamilton again contacted the Department seeking reemployment.

58. According to Henry Ervin ("Ervin"), the Personnel Director for the Department, Hamilton stated that he had been given the run around by the State of Alabama since 2005.

59. The Department reemployed Hamilton in August of 2007, at its Greil facility as a MHA.

60. The Department did not have to secure new funding in order to hire Hamilton in 2007; it simply moved funding from another open position.

61. At the time of Hamilton's reemployment with Greil, at least one of the MHAs working there had been employed with Hamilton at Tarwater.

62. In fall 2007, Hamilton requested the Department provide him with certain benefits he believed he was entitled to because his continuous employment was interrupted by military service. The Department denied Hamilton's request.

63. As a result, on February 6, 2008, Hamilton filed a complaint under USERRA with the United States Department of Labor.

64. The United States Department of Labor's Veterans' Employment and Training Service conducted an investigation and found that Hamilton's claim had merit.

65. The Department of Labor was unable to resolve Hamilton's complaint, and his case was referred to the United States Department of Justice.

66. On December 30, 2008, the United States filed its Complaint in this action alleging that the Department violated USERRA by failing to promptly reemploy Hamilton upon his return from active military service.

67. The United States filed suit within the same year that Hamilton filed his complaint with the Department of Labor.

68. The Department's compensation for the position of custodial worker position was grade 39 from 2000 to present.

69. Hamilton received a salary of $755.50 bi-weekly at the Department in 2003.

70. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $755.50 biweekly from April 12, 2005 to September 30, 2005.

71. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $800.80 biweekly from October 1, 2005 to December 31, 2005.

72. Hamilton did not receive longevity pay from the Department in 2004 or 2005. Had the Department reemployed Hamilton in April 2005, and treated Hamilton as continuously employed during his deployment to Iraq, Hamilton would have earned $500 in longevity pay on December 1, 2005.

73. Employees of the Department were entitled to up to 168 hours of military leave pay in 2004 and 2005. Hamilton did not receive military leave pay from the Department in 2004 or 2005.

74. Had the Department reemployed Hamilton in April 2005 in his pre-service position, and treated Hamilton as continuously employed during his deployment to Iraq,

Hamilton would have received 168 hours of military leave pay for service in 2004 and 2005 respectively, at a rate of $755.50 biweekly ($9.44 per hour), totaling $3,171.84.

75. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $800.80 biweekly from January 1, 2006 to March 3, 2006.

76. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $867.50 semimonthly from March 4, 2006 to September 30, 2006.

77. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $910.90 semimonthly from October 1, 2006 to December 31, 2006.

78. Had the Department reemployed Hamilton in April 2005, and treated Hamilton as continuously employed during his deployment to Iraq, Hamilton would have earned $500 in longevity pay on December 1, 2006. Hamilton did not receive longevity pay from the Department in 2006.

79. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $910.90 semimonthly from January 1, 2007 to September 30, 2007.

80. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $942.80 semimonthly from October 1, 2007 to December 31, 2007.

81. Had the Department reemployed Hamilton in April 2005, and treated Hamilton as continuously employed during his deployment to Iraq, Hamilton would have earned $600 in longevity pay on December 1, 2007.

82. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $942.80 semimonthly from January 1, 2008 to September 30, 2008.

83. Had the Department reemployed Hamilton in April 2005 in his pre-service position, Hamilton would have earned $975.80 semimonthly from October 1, 2008 to December 31, 2008.

84. Had the Department reemployed Hamilton in April 2005, and treated Hamilton as continuously employed during his deployment to Iraq, Hamilton would have earned $600 in longevity pay on December 1, 2008, at the Department.

85. From November 17, 2005 to December 31, 2005, Hamilton earned $4,262.50 at Norment Security Group, Inc.

86. From January 1, 2006 to December 31, 2006, Hamilton earned $28,491.42 at Norment Security Group, Inc.

87. From January 1, 2007 to March 16, 2007, Hamilton earned $5,552.22 at Norment Security Group, Inc.

88. From May 10, 2007 to August 8, 2007, Hamilton earned $5,465.58 at Big Lots.

89. Hamilton was reemployed at the Department on August 16, 2007.

90. From August 16, 2007 to August 31, 2007, Hamilton earned $888.40 semimonthly at the Department.

91. From September 1, 2007 to December 31, 2007, Hamilton earned $919.50 semimonthly at the Department.

92. On December 10, 2007, the Department paid Hamilton $500 in longevity pay.

93. From January 1, 2008 to July 31, 2008, Hamilton earned $919.50 semimonthly at the Department.

94. From August 1, 2008 to August 31, 2008, Hamilton earned $942.80 semimonthly at the Department.

95. From September 1, 2008 to December 31, 2008, Hamilton earned $975.80 semimonthly at the Department.

96. On December 1, 2008, Hamilton earned $500 in longevity pay.

97. Hamilton's back pay damages for the year 2005, including expected earnings had he been continuously employed at the Department minus his actual earnings, calculated on a quarterly basis, equal $13,064.89 plus interest.

98. Hamilton accrued no additional back pay damages during 2006.

99. Hamilton's back pay damages for the year 2007, including expected earnings had he been continuously employed at the Department minus his actual earnings, calculated on a quarterly basis, equal $3,190.24 plus interest.

100. Hamilton's back pay damages for the year 2008, including expected earnings had he been continuously employed at the Department minus his actual earnings, calculated on a quarterly basis, equal $354.120 plus interest.

101. From April 12, 2005 to September 30, 2005, the Department's employer retirement contribution rate was 5.57 percent.

102. From April 12, 2005 to September 16, 2005, Hamilton would have earned $8,658.00 at the Department had he been reemployed.

103. From April 12, 2005 to September 16, 2005, the Department's employer retirement contribution for Hamilton would have been $482.25.

104. From October 1, 2005 to December 31, 2005, the Department's employer retirement contribution rate was 6.77 percent.

105. From October 1, 2005 to November 6, 2005, Hamilton would have earned $2,002.00 at the Department had be been reemployed.

106. From September 17, 2005 to November 6, 2005, the Department's employer retirement contribution for Hamilton would have been $186.69.

107. Because Hamilton had no new back pay damages in 2006, the parties have not calculated retirement damages for the year 2006.

108. From January 1, 2007 to September 30, 2007, the Department's employer retirement contribution rate was 7.78 percent.

109. From January 1, 2007 to August 15, 2007, Hamilton would have earned $13,663.95 at the Department had he been reemployed.

110. From January 1, 2007 to August 15, 2007, the Department's employer retirement contribution for Hamilton would have been $1,063.06.

111. From August 16, 2007 to December 31, 2007, the difference between what Hamilton would have earned at the Department had he been continuously employed and his actual the Department earnings was $208.90.

112. From August 16, 2007 to December 31, 2007, the Department's additional employer retirement contribution for Hamilton would have been $21.43.

113. Hamilton's total employer retirement contribution damages are $1,730.77.

114. Hamilton was a merit system employee of the State of Alabama and the Department through December 31, 2003, and is currently a merit system employee of the State of Alabama and the Department.

115. As of July 26, 2009, Hamilton holds 18 years and 5 months service credit at the Department.

116. As of May 2010, Hamilton accrues 7 hours and 25 minutes annual leave each pay period.

117. As of May 2010, Hamilton accrues 4 hours and 20 minutes sick leave each pay period.

118. Had Hamilton been continuously employed at the Department since the time of his initial appointment on July 13, 1987, Hamilton would accrue 8 hours and 40 minutes of annual leave each pay period as of July 26, 2009.

119. Hamilton's current continuous service date at the Department is February 26, 1991.

## II. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this action pursuant to 38 U.S.C. § 4323(b).

2. Venue is proper in the Court pursuant to 38 U.S.C. §4323(c)(1) and 28 U.S.C. § 1391(b).

3. To be entitled to reemployment rights and benefits under USERRA, 38 U.S.C. § 4312(a)(1), a servicemember must (1) give "advance written or verbal notice" of his military service to his employer; (2) serve for less than five years; and (3) timely apply for reemployment upon return.

4. In compliance with Section 4312(a)(1) of USERRA, the credible evidence establishes that Hamilton gave advance verbal and/or written notice of his military service in 2003.

5. Hamilton's absence from employment at the Department between January 2004 and April 2005 was by reason of service in the uniformed services and did not exceed five years.

6. Also in compliance with Section 4312(a)(1) of USERRA, the credible evidence establishes that Hamilton timely sought reemployment. Because Hamilton's military service exceeded 180 days, he was obligated under USERRA to seek reemployment within 90 days after completing service. *See* 38 U.S.C. § 4312(e)(1)(D). Hamilton sought reemployment in April 2005, within the same month of his release from active duty military service, at three locations, Greil Hospital, the "Central Office" of the Department, and the location where Hamilton believed the State Personnel Department was located.

7. Because Hamilton, in compliance with USERRA, gave advance notice of his military service, served for less than five years, and timely sought reemployment, Hamilton was entitled to reemployment rights and benefits under USERRA.

8. USERRA Section 4312(d)(1)(C) does not excuse the Department from its obligation to reemploy Hamilton. This affirmative defense applies to employment that for "both a brief, nonrecurrent period" and where there is "no reasonable expectation that such employment will continue indefinitely or for a significant period of time." Hamilton held the employment status of permanent employee at the Department between 1988 and his absence for reason of active duty service in the uniformed services. In addition, Hamilton's employment at the Department was not for a brief, nonrecurrent period. Accordingly, the Department cannot meet its burden of proving the "brief non-recurrent period" affirmative defense.

9. Reemployment of Hamilton in 2005 would not have imposed an undue hardship on the Department under USERRA Section 4312(d)(1)(B). This affirmative defense, by definition, applies only to servicemembers who either are not qualified, or cannot become qualified, for reemployment without undue burden to the employer. In 2005, Hamilton was qualified for MHA, MHW, custodial worker, laborer, and groundskeeper positions at the Department. Reemploying Hamilton in 2005 also would not have caused the Department significant difficulty or expense. Accordingly, the Department cannot meet its burden of proving the "undue hardship" affirmative defense.

10. The Department's circumstances did not change as to make reemployment of Hamilton in 2005 impossible or unreasonable under USERRA Section 4312(d)(1)(A). In

2005, the Department hired numerous employees in positions for which Hamilton was qualified. Accordingly, the Department cannot meet its burden of proving the "changed circumstances" affirmative defense.

11. Hamilton did not waive his USERRA right to reemployment at the Department. To the extent that it is possible to prospectively waive one's employment rights under USERRA, there are "strong reasons of policy for ruling out such prospective waivers in all but the most exceptional circumstances." *Lapine v. Wellesley*, 304 F.3d 90, 105 (1st Cir. 2002). Although Hamilton declined a transfer, which the Department considered a voluntary resignation effective one month later, when the Tarwater facility was scheduled to close, Hamilton had already notified the Department of his impending military duty when he declined the transfer. Therefore, his voluntary resignation could not operate to terminate his reemployment rights. *See id.* at 103.

12. Further, other than declining the transfer, Hamilton did not expressly or by conduct engage in the kind of behavior that could establish a knowing, voluntary, clear and unequivocal waiver of his USERRA rights. *See id.* 107-08. Accordingly, Hamilton was entitled to reemployment despite his declination of the transfer.

13. No statute of limitations, including any state statute of limitations, bars the claim in this action. USERRA expressly provides that there is no limit on the period for filing a complaint under the statute. 38 U.S.C. § 4327(b).

14. This action is not barred by laches because neither the United States nor Hamilton inexcusably delayed in pursuing this case, and there is no evidence of undue prejudice to defendant.

15. With respect to remedies, USERRA provides that the court "may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions" of the statute. 38 U.S.C. § 4323(d)(1)(B). USERRA further provides that a "State shall be subject to the same remedies, including prejudgment interest, as may be imposed upon any private employer." 38 U.S.C. § 4323(d)(3).

16. The court may award lost wages or benefits to the United States for the damages suffered by Hamilton as a result of the Department's failure to comply with USERRA's reemployment provisions, and any such award shall be paid, on order of the Attorney General, directly to Hamilton. 38 U.S.C. § 4323(2)(B).

17. USERRA, 38 U.S.C. § 4302(b), expressly supersedes any state statute precluding the Department from paying prejudgment interest.

18. Hamilton's back pay damages are $21,597.34.

19. Hamilton is entitled to the employer's retirement contribution on his back-pay award, constituting $1,753.43.

20. Hamilton's annual leave damages are 197.25 hours or $2,187.24, at his current rate of pay.

21. Hamilton's sick leave damages are 72 hours or $810.72, at his current rate of pay.

22. Hamilton is entitled to restoration of his continuous service date to the date of his original hire, July 13, 1987.

23. The United States is entitled to injunctive relief, including amendments to the Department's policies and procedures, to ensure the Department's future compliance with USERRA and mandatory training for all the Department managers and personnel officials.

24. The United States is DIRECTED to file its proposal regarding the injunctive relief it seeks, by no later than August 20, 2010. The Department may respond or object to the proposal by no later than September 3, 2010.

DONE this the 27th day of July, 2010.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE